## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BERISH BERGER, KILBRIDE INVESTMENTS LIMITED, BUSYSTORE LIMITED, TOWERSTATES LIMITED, BERGFELD CO. LIMITED and ARDENLINK LIMITED,<br>　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>ELI WEINSTEIN; RAVINDER CHAWLA, MARK SAHAYA, 2040 MARKET ASSOCIATES, LP; JFK BLVD ACQUISITION PARTNERS, L.P.; PINE PROJECTS LLC; and WORLD ACQUISITION PARTNERS CORPORATION,<br><br><br>　　　　　　　Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br><br>NO. 08- |

## COMPLAINT

Plaintiffs Berish Berger, Kilbride Investments Limited, Busystore Limited, Towerstates Limited, Bergfeld Co. Limited and Ardenlink Limited, for their complaint, allege:

## INTRODUCTION

1.　　　Plaintiffs' claims result from an intricate scheme to defraud perpetrated by three people -- Ravinder Chawla, Mark Sahaya and Eli Weinstein (collectively, the "Individual Defendants") -- acting individually and through the named corporate defendants.  The scheme was based on deceitful transactions involving Philadelphia real estate.  To implement their scheme, the Individual Defendants specifically targeted the insular Orthodox Jewish community in their search for victims.

2.    As a wealthy member of the Orthodox community, plaintiff Berger presented an attractive target who was involved in the real estate industry and had access to capital through corporations closely associated with his family.  Moreover, Berger lives in London and his real estate activities are principally in the United Kingdom.  Accordingly, he was relatively unfamiliar with Philadelphia real estate.

3.    As detailed below, the Individual Defendants fraudulently induced Berger to believe he was purchasing two parcels of Philadelphia real estate -- the River City property[1] and 2040 Market Street.

(a)    The Individual Defendants conspired to present River City to Berger as an opportunity for a major development involving towering 600-foot skyscrapers that Chawla's architect had already designed while concealing from Berger the fact that the Philadelphia City Council was adopting a 125-foot height limit that truncated much of the plans presented by defendants.

(b)    The Individual Defendants also conspired to present 2040 Market Street to Berger as an opportunity to purchase the property and immediately sell only the "air rights" for more than the purchase price (*i.e.*, receiving a cash profit and retaining ownership of the land and existing building), while concealing from Berger the fact that there was no potential purchaser interested in the "air rights."

4.    The Individual Defendants used a series of lies, sham transactions and fraudulent documents to induce Berger and the other plaintiffs to send them millions of dollars on four occasions.  The Individual Defendants, acting in concert, then diverted

---

[1]    The "River City" property has been referred to at times as the "JFK" property or properties.  The site is 8¼ acres in Philadelphia adjacent to and north of JFK Boulevard and just east of the Schuylkill River.

plaintiffs' money from the two promised purchases, misappropriating the money for their own benefit.

5.      By the time plaintiffs realized that they were being defrauded, the Individual Defendants had diverted and split among themselves more than $36 million of plaintiffs' money and had arranged for 100% of the equity in the two parcels of real estate to be held in the name of companies that were owned and controlled by Ravinder Chawla, his family members and his partners.  As a result, plaintiffs received nothing in return for their money.

6.      As set forth below, plaintiffs seek restitution of the funds they were fraudulently induced to transfer to the control of the Individual Defendants, enforcement of their equitable interests in the River City property and 2040 Market Street, as well as in any properties in which defendants invested plaintiffs' funds, and plaintiffs respectfully request that the Individual Defendants be punished monetarily for their reprehensible misdeeds.

## PARTIES

### Plaintiffs

7.      Plaintiff Berish Berger resides in and is a citizen of the United Kingdom. Berger's activities with respect to River City and 2040 Market Street were undertaken on behalf of himself, as a member of the Berger family, and certain Berger family-owned or family-affiliated businesses, including the other plaintiffs.  Berger manages his family's real estate business through numerous family-owned business entities.  In general, the family-owned businesses own the family's real estate assets and the capital invested in real estate acquisitions identified by Berger is provided by the family-owned or family-affiliated businesses.

3

8.      Busystore Limited ("Busystore") is a private limited company organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.  The directors of Busystore are Berger, his wife and his son. Busystore is owned solely by Astralmain Limited, which is owned solely by Berger's wife.  On June 30, 2008, Busystore assigned to Berger whatever claims it may have against the defendants arising from the facts and circumstances alleged herein.

9.      Towerstates Limited ("Towerstates") is a private limited company organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.  The directors of Towerstates are Berger, his wife and his son.  The shares of Towerstates are owned by Berger (1%) and his wife (99%).  On June 30, 2008, Towerstates assigned to Berger whatever claims it may have against the defendants arising from the facts and circumstances alleged herein.

10.     Bergfeld Co. Limited ("Bergfeld") is a private limited company organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.  The directors of Bergfeld are Berger, certain of his brothers, sisters and brothers-in-law.  All the shares of Bergfeld are owned by Tripform Limited, which is jointly owned by Berger, his brother-in-law and a family friend.  On June 30, 2008, Bergfeld assigned to Berger whatever claims it may have against the defendants arising from the facts and circumstances alleged herein.

11.     Ardenlink Limited ("Ardenlink") is a private company limited by guarantee and not having a share capital organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.  The directors of Ardenlink are Berger, his wife and his son.  The guarantors of Ardenlink are Berger, his

4

wife and his son.  On June 30, 2008, Ardenlink assigned to Berger whatever claims it may have arising from the facts and circumstances alleged herein.

12.     Kilbride Investments Limited ("Kilbride") is a company incorporated under the laws of Gibraltar which is ultimately owned by a discretionary trust established in Gibraltar for the benefit of the children and remoter issue of Berger's father, with its principal place of business in Gibraltar.  On June 30, 2008, Kilbride assigned to Berger whatever claims it may have arising from the facts and circumstances alleged herein.

13.     In reliance on defendants' misrepresentations as set forth below, (i) on December 18, 2006, acting on Berger's request, Kilbride made an advance of $12 million to an account in the United States controlled by defendant Weinstein for an investment that Weinstein promised Berger would be made to acquire a Philadelphia real estate development project known as River City; (ii) on December 19, 2006, acting on Berger's request, Busystore made an advance of $9.5 million to an account in the United States controlled by defendant Weinstein for an investment that Weinstein promised Berger would be made to acquire a Philadelphia property at 2040 Market Street; (iii) on January 8, 2007, acting on Berger's request, Towerstates and Ardenlink made advances of $4 million and $6 million, respectively, to an account in the United States controlled by defendant Weinstein to be used, Weinstein promised Berger, to complete the acquisitions of River City and 2040 Market Street; and (iv) on January 19, 2007, acting on Berger's request, Bergfeld made an advance of $5 million to an account in the United States controlled by defendant Weinstein to be used, Weinstein promised Berger, to complete the acquisitions of River City and 2040 Market Street.  As set forth

below, the entire $36.5 million advanced by plaintiffs was misappropriated by defendants and plaintiffs received nothing in return.

14.    Berger understood and believed that he was personally obligated to repay $36.5 million of funds advanced by Kilbride, Busystore, Towerstates, Ardenlink and Bergfeld and that he was personally damaged by defendants' fraud and misappropriation of the $36.5 million.

15.    In *Berger v. Weinstein, et al.*, Civil Action No. 07-0994 (E.D. Pa.), this Court granted summary judgment to these same defendants based on its determination that Berger had not established standing, as of the date of the filing of the complaint, to recover the damages caused by defendants' fraud.

**Defendants**

16.    Upon information and belief, defendant Eli Weinstein is a New Jersey resident.

17.    Defendant Pine Projects LLC ("Pine Projects") is a New Jersey limited liability company controlled by Weinstein with a principal place of business at 805 Cross Street, Lakewood, NJ.

18.    Upon information and belief, defendant Ravinder Chawla ("Chawla") is a Pennsylvania resident.

19.    Defendant World Acquisition Partners Corporation ("WAP") is a Pennsylvania corporation controlled by Chawla with a principal place of business at 3103 Philmont Avenue, Huntingdon Valley, PA 19006.  At all relevant times, WAP maintained a principal place of business at 380 Red Lion Road, Huntington Valley, PA 19006.

20.   Defendant Mark Sahaya ("Sahaya") is, upon information and belief, a New Jersey resident.  At all relevant times, he maintained a business office at 380 Red Lion Road, Huntington Valley, PA 19006.

21.   Defendant JFK BLVD Acquisition Partners L.P. is a Pennsylvania limited partnership, with an address at 3103 Philmont Avenue, Huntington Valley, PA 19006. Upon information and belief, JFK BLVD Acquisition Partners L.P. holds title to the River City property, and is controlled by Chawla and/or his family members and/or his partners.

22.   Defendant 2040 Market Associates, LP is a Pennsylvania limited partnership with an address at 3103 Philmont Avenue, Huntington Valley, PA 19006. Upon information and belief, 2040 Market Associates, LP holds title to 2040 Market Street in Philadelphia, PA, and is controlled by Chawla and/or his family members and/or his partners.

## JURISDICTION AND VENUE

23.   This Court has jurisdiction over this action, pursuant to 28 USC § 1332(a), as the action is between citizens or subjects of the United Kingdom and Gibraltar, on one side, and, on the other side, citizens of New Jersey, Pennsylvania and Delaware.

24.   Venue is proper in this district, pursuant to 28 USC § 1391, as it is the judicial district in which (a) a substantial part of the acts giving rise to the claims alleged in this complaint occurred, and (b) the properties that are the subject of this complaint are located.

## THE RELEVANT FACTS

I.   **The River City Fraud**

25.   In early 2006, Ravinder Chawla saw an opportunity to make a $70 million profit with little or no investment by simultaneously acquiring and flipping an assemblage of real estate in Philadelphia known as River City.

26.   The River City property is approximately 8.2 acres of land located at 2001-2045 JFK Blvd., 2101-2145 JFK Blvd., 2201-2245 JFK Blvd., 2301-2345 JFK Blvd., and 60 North 23rd Street, Philadelphia.

27.   It was Chawla's plan to acquire the River City property for approximately $32.5 million from R&F Penn Center Associates, L.P. ("R&F Penn") and flip it to others for as much as $100 million.

28.   Chawla enlisted the assistance of Sahaya to find a buyer who would pay $100 million for River City and promised Sahaya a $10 million commission if Sahaya succeeded in finding such a buyer.

29.   Both Chawla and Sahaya have extensive contacts among members of the Orthodox Jewish community.

30.   In about May 2006, Chawla, acting through a special purpose entity he effectively controlled, entered into a contract to purchase the River City property for $32.5 million.  During the same period, the River City property was being actively marketed by Sahaya and others to members of the Orthodox community.  During the summer of 2006, one such prospective purchaser indicated an interest in acquiring the River City property for $100 million and another indicated an interest in acquiring the River City property for $67 million.  However, by August 2006, both potential buyers had decided not to purchase the property.

31.     The contract Chawla executed to purchase the River City property from R&F Penn required him to complete the acquisition by September 25, 2006.  Because the potential re-sales that Chawla and Sahaya were working on fell through, and because it was Chawla's plan to flip the River City property without investing a significant amount of his own funds, Chawla arranged in July 2006 to pay R&F Penn a non-refundable deposit of $350,000 to extend the deadline for completing the acquisition.

32.     In about late August 2006, Sahaya advertised the River City property to Eli Weinstein and Weinstein expressed an interest in purchasing the property for $62.5 million.

33.     During August and September 2006, Chawla and Weinstein, with the participation of Sahaya, agreed to the terms of a potential sale of River City.

34.     The plan the Individual Defendants initially agreed to was based on the expectation that Chawla would arrange a mortgage on the River City property from a commercial lender in the amount of $52 million.  Weinstein would pay $10 million for the equity in the River City property using funds he would obtain from others.  If the plan succeeded, Chawla would immediately receive approximately $30 million and Weinstein would own a portion of the equity based on whatever arrangement he could negotiate with the source of the $10 million.

35.     Weinstein also agreed that he would provide additional cash to the extent that the mortgage Chawla sought to arrange fell short of the $52 million that the Individual Defendants expected.  Their agreement was set forth in a so-called "Nominee Agreement" dated September 26, 2006, and signed by Chawla and Weinstein.

36.     Chawla, Sahaya and Weinstein believed that Chawla would be able to arrange a mortgage loan of $52 million based on Chawla's use of a so-called "development factor" to greatly overstate the apparent value of the River City property. Chawla, acting through WAP, engaged an architect -- James Rappoport ("Rappoport") -- to create elaborate development plans to try to justify a $52 million mortgage on property which Chawla was purchasing for $32.5 million. At Chawla's instruction, Rappoport prepared architectural designs for a vision of what River City purportedly could become: a massive 8 to 12 million square foot development. This included a three-dimensional computer model of his River City design with an animated "fly-through" of the 3-D model, a PowerPoint presentation, detailed drawings and schematics, and a promotional memorandum describing Rappoport's designs. The plan was for Rappoport to showcase his design to prospective lenders and purchasers and thereby cash in on an inflated valuation of the River City property.

37.     A key point emphasized by Rappoport, the architect for the Individual Defendants, in his presentation materials for River City was the assertion that his design could be built "as of right." The phrase "as of right" means that the designs could be built under the applicable Philadelphia zoning laws without a variance. He also claimed there was no legal height limitation.

38.     To enhance the "development factor" that he was creating, Chawla obtained a formal appraisal of the River City property from Cushman & Wakefield. The Cushman & Wakefield appraisal valued the River City property at $77 million in view of its development potential as portrayed by the Rappoport designs.

10

39.     To enhance the characterization of Rappoport's River City designs as buildable "as of right," Chawla procured a memorandum from the Blank Rome law firm analyzing Rappoport's designs.  The Blank Rome memorandum confirmed that the designs were buildable "as of right."

40.     Notwithstanding the extensive materials that Chawla had obtained to sustain the appearance of enormous development value, his efforts to obtain a $52 million mortgage on the River City property failed.  Meanwhile, Chawla obtained extensions from R&F Penn of his deadline to complete the acquisition of the River City property in August, September and October 2006 by increasing to $1.9 million the non-refundable deposit given to the sellers.  The final deadline for completing the $32.5 million purchase arranged by Chawla was December 18, 2006.

41.     Prior to agreeing to terms with Weinstein and attempting to arrange a $52 million mortgage on the River City property, Chawla learned of a zoning ordinance pending in the Philadelphia City Council that would drastically curtail the development of River City by imposing a 125-foot height limit on any building to be constructed on most or all of the River City property.  Chawla knew that the new 125-foot height law would severely curtail the economic viability of the River City property and that Chawla and Rappoport's design, which included numerous buildings of more than 600 feet in height, would be infeasible.

        (a)     On August 23, 2006, Chawla's zoning attorney wrote to Chawla and others: "During our last telephone call we discussed the impact of the ordinance creating the BFParkway overlay and its impact on what we have referred to as parcels D and E [of River City]. . . . Please note that the impact of the ordinance could be

perhaps an 80% reduction in total FAR [buildable area] since building height will be capped at 125 ft from grade."

(b)   On August 30, 2006, Chawla's principal architect Rappoport advised Chawla and others that it was too late to avoid the adverse impact of the 125-foot height law because, whenever it got enacted, the effective date of the law would relate back to the "magic date" in June 2006 when the City Council first passed the ordinance.

(c)   On October 24, 2006, Chawla's architect characterized the impending 125-foot height law in a communication to Chawla and others as an "important stumbling block to our Philadelphia River City master plan."

(d)   On November 22, 2006, Chawla's zoning attorney advised Chawla's partner Zeghibe that: "As we discussed, Clarke's amended overlay district for the parkway now expands the 125-foot height limit from parcels D and E to now include all 5 [River City] parcels.  This means that no building can be built on the entire River City project in excess of 125ft.  Effect, project value drops 75%. . . .  We need this buried in committee through year end."

(e)   On November 22, 2006, recognizing the significance of the 125-foot height law, Karen Daroff, another Chawla architect, solicited Pennsylvania Governor Rendell for "Urgent help for the River City Project."  Daroff advised the Governor's staff that Philadelphia "Councilman Clarke has now amended the proposed overlay district for the Parkway and it now expands the 125 ft height limit from parcels D&E to now include all 5 parcels of River City.  This means that no building can be built on the entire River City project in excess of 125 ft., thus this project value drops 75%, and the whole

urban development deal will die.  The economics of this deal will no longer work. . . . We desperately request the Governor's assistance to either amend or bury this proposed ordinance in committee. . . ."

        (f)      On November 26, 2006, Rappoport wrote to Philadelphia Mayor Street, councilpersons, and senior members of the Philadelphia Planning Commission technical staff that the 125-foot height law "would reduce current property values by about $1billion" and "urge[d]" them "to vote no on Councilman Clarke's [125-foot height law]."  Rappoport copied Chawla.

        (g)      On November 27, 2006, Chawla acknowledged the huge adverse impact of the new 125-foot height law, telling his lead architect that under the ordinance which was about to be passed unanimously, "the current property value will reduce by more than $1 billion in my opinion."

        (h)      On November 28, 2006, a hearing on the 125-foot height law was held before the Committee on Rules of the City Council.  At the hearing the 125-foot height law was formally amended to limit to 125 feet the height on any building on parcels D and E of River City, more than half of the property.

        (i)      After attending the November 28, 2006 hearing of the Philadelphia City Council regarding the 125-foot height law on behalf of Chawla and his partner Zeghibe, Chawla's zoning counsel, Naselsky, wrote a series of e-mails to Chawla, Zeghibe and Rappoport.  Naselsky told Zeghibe:  "In a nutshell the hearing did not go well and the ordinance has been voted out of committee favorably . . . It will then go to mayor for signature which he may sign before the year is out. . . . Clarke [the law's sponsor] intends to steam roll this through. . . . "

(j)     Chawla's zoning attorney advised that the 125-foot height law "presents many problems not the least of which is the notion that with a height limitation in place, lenders will re-evaluate the development potential and will not underwrite the deal in the same way.  Moreover, you can not rely nor tell lenders that the situation will be fixed through the grant of a variance by the [Zoning Board of Appeals], even with civic association and Clarke support."  He warned Chawla "don't get your hopes up," that the 125-foot height limit "puts the project, as currently designed in serious jeopardy and in fact there is little chance that it can be reliably developed from a land use perspective at any where near 50% of the FAR [buildable area] you contemplate and which is permitted currently."

(k)     As the new height law became more certain, it presented "a real crisis" for defendants.  In the evening on November 28, 2006, Chawla's zoning expert wrote an e-mail to Chawla and others regarding the 125-foot height law, stating that "We need to get to the Mayor urging him to veto the bill" and that "Clarke could fix the issue by carving out the [River] City property from the [125-foot height law]," but "[t]hat would make the ordinance even more suspect as being rigged and subject to challenge."  In response to this e-mail, Rappoport recorded:  "This is a real crisis. . . . This is a Billion Dollar issue!"

42.     Chawla recognized the drastic impact which the new 125-foot height law would have on River City.  Because of the pending new 125-foot height law, Chawla or his partner Zeghibe went back to R&F Penn a "couple of times" to request a discount in their $32.5 million purchase price.

43.     Chawla met with at least four Philadelphia councilmen in an unsuccessful attempt to persuade them to vote against the new height law.  Not a single councilman said that "he or she was prepared to vote against the 125-foot law when it came before the City Council" and none of them "encourage[d] [Chawla] to believe that they would be able to bury the bill in committee through the end of the year."  The 125-foot height law was enacted by the City Council and signed by the Mayor without any relief for Chawla's River City property.

44.     Because Chawla knew that he would be unable to obtain relief from the 125-foot height law through legitimate means, he conspired with his attorney, Andrew Teitelman, to corrupt a public official.  Upon information and belief, Chawla and Teitelman provided material benefits to the official in exchange for the official's assistance in Chawla's attempt to obtain relief from the height law.  However, even Chawla's corrupt efforts proved unsuccessful and he was unable to obtain relief from the height law.

45.     On November 6, 2006, to help conceal the 125-foot height law from potential buyers and lenders, Chawla's zoning attorney submitted a formal memo to Chawla's partner Richard Zeghibe entitled "Philadelphia River City."  The stated purpose of the zoning memo was to "confirm whether it is possible to construct the building area as [Rappoport] has proposed, as of right, and without a variance, under the Philadelphia Zoning Code."  Despite the prior acknowledgement  by Chawla and his zoning attorney that the 125-foot height law would destroy the economic viability of the River City property, the zoning memo omits all mention of the then pending 125-foot height limit on the River City property.

15

46.     By the end of November 2006, Chawla had determined that he could only arrange for a mortgage of $20 million for the River City property.

47.     While Chawla was learning that the new 125-foot height law would destroy the development value of River City and that he could only obtain a $20 million mortgage on the River City property, he also learned that Weinstein was not a reliable source of funds to make up the $30 million shortfall on the amount of the mortgage. Despite Weinstein's promise to deposit $3 million for the River City property, Weinstein provided no deposit money.  Additionally, although Weinstein promised to pay various expenses incurred in connection with the River City transaction, Weinstein submitted many checks which were dishonored, and both Chawla and Sahaya knew of Weinstein's bounced checks.

48.     The Individual Defendants modified their agreement to accommodate the facts that the River City mortgage was only for $20 million, Weinstein did not have the $62.5 million he promised and the new zoning law made the River City designs virtually worthless.  It was agreed that, if Weinstein provided $12 million towards the purchase of the River City property by December 18, 2006 -- the "drop-dead" date for Chawla to complete his $32.5 million acquisition of the River City property -- then Weinstein would have two years to pay the balance of the agreed $62.5 million purchase price for the River City property.  Weinstein agreed that if he did not complete his purchase within two years or if he otherwise defaulted, his initial $12 million would be forfeited.

49.     The $12 million that Chawla would get from Weinstein, combined with the $20 million mortgage that Chawla had arranged, would be enough to allow Chawla to complete the acquisition of the River City property using other people's money.  The

Individual Defendants knew that the $12 million that Weinstein promised to provide would come from "investors" to be identified by Weinstein.

50.     Weinstein targeted Berger as a potential source for the money which he had promised to Chawla.

51.     In the Orthodox Jewish community from which Berger comes, successful business relationships are founded upon trust and confidence; a businessman's word is his bond; and a reputation for integrity is greatly respected.  Weinstein and Chawla knew these facts and exploited them in their scheme to defraud Berger.

52.     In November 2006, Berger, while in London, was told by Chaim Zev Leifer, a real estate broker, that Weinstein was a reputable and successful real estate investor, as well as a respected philanthropist, who knew of valuable investment opportunities.  Leifer said that Weinstein would be visiting London shortly and advised Berger to meet Weinstein to discuss possible investments.

53.     Upon information and belief, Leifer's "sales pitch" to Berger was procured by Weinstein.  Thereafter, Leifer repeatedly made telephone calls to Berger to encourage him to meet Weinstein.  Other individuals trusted by Berger also contacted him to praise Weinstein and vouch for his integrity.  Upon information and belief, Weinstein also arranged these contacts.

54.     As a result of these recommendations, Berger agreed to meet Weinstein in London in November 2006.  Weinstein then informed Berger about real estate opportunities Weinstein had identified in Philadelphia.  In particular, Weinstein described what Berger would learn was the River City property as an extraordinary investment opportunity.  He invited Berger to come to Philadelphia to see the project.

55.     Three to four weeks later, in December 2006, Berger visited the United States and was again importuned by Weinstein to come to Philadelphia to see the River City property.  Berger did so.

56.     On or before December 4, 2006, Sahaya, at Weinstein's request, asked Chawla to arrange for Chawla's architect to give a presentation to "Eli's investor Group" on December 6, 2006.

57.     On December 6, 2006, a meeting with Berger was convened at Rappoport's office attended by Berish Berger, Chawla, Sahaya and Weinstein, among others, to encourage Berger to invest in River City.  At the meeting, Chawla and his architect showed Berger a video of a three-dimensional architectural rendering, drawings and a PowerPoint presentation all showing a 12-million square foot development plan for River City with many buildings over 50 stories tall, vastly taller than the Philadelphia new height law would permit on much of the property.  Rappoport gave a PowerPoint presentation which omitted the drastic impact which Chawla and his architect recognized would result from the pending 125-foot height law.

58.     At no time during or after the December 6, 2006 meeting did anyone tell Berger about the 125-foot height law or the tremendous reduction in value to River City it would cause.  Nor did anyone show him drawings or calculations that depicted buildings which complied with the new law.  Instead, Rappoport falsely stated that the towering 50-plus-story River City designs he presented could be built "as of right."

59.     Weinstein and Chawla repeatedly represented that the buildable square footage at River City property was 8 to 12 million square feet, as demonstrated by

Rappoport's design, and that many others were interested in buying this site for more than the proposed $62.5 million purchase price.

60.     Berger did not agree to participate in any transaction while at the December 6, 2006 meeting.

61.     After the December 6, 2006 meeting with Berger, Chawla and Weinstein gave Berger a collection of documents on a CD which purported to represent the development potential of River City. Among the materials provided to Berger was a Rappoport memo entitled "Proposed 11,931,000 gross square foot 8.2 Acre JFK Boulevard Air Rights Development." Rappoport prepared the memo "to more fully describe the potential as-of-right development for [River City]" and expressly represented that there were "no height restrictions" on the River City property. All of the other materials provided to Berger omitted any mention of the drastic impact which Chawla and his architect recognized would result from the impending 125-foot height law.

62.     After the December 6, 2006 meeting, and before plaintiffs' first transfer of funds to Weinstein on December 18, 2006, Berger received from defendants Weinstein, Sahaya, Chawla and WAP a June 23, 2006 Cushman & Wakefield appraisal, valuing the River City property at $77 million. The Cushman & Wakefield appraisal was prepared for Chawla at the request of his zoning attorney and fails to take into account any possible 125-foot height limit. The appraised value of $77 million was consistent with and reinforced the credibility of the representations to Berger that a commercial lender was providing a $51.5 million mortgage on the River City property.

63.     Weinstein represented to Berger that a bank would loan $51.5 million for the River City property.  This representation was significant to Berger because it indicated to him that a major financial institution had evaluated this investment and had concluded that the property value substantially exceeded $51.5 million.  Weinstein's representation was false because the $51.5 million in bank financing did not exist.

64.     Weinstein also intentionally concealed from Berger that Chawla would be simultaneously acquiring the River City property for $32.5 million.

65.     During the weeks following Berger's meeting in Philadelphia, and prior to Berger providing any money, the 125-foot height law was unanimously approved by the Philadelphia City Council by a vote of 17-0 on December 14, 2006 without any exception for Chawla's River City property.  No one disclosed to Berger the 125-foot law's unanimous approval and imminent enactment.

66.     Throughout December 2006, Weinstein repeatedly telephoned Berger in London, stating that closings on River City and 2040 Market Street were imminent, that the funding needs were an emergency, and that Weinstein would suffer dire consequences if Berger did not promptly contribute his "share" of the investments. Weinstein told Berger that his share would be 80%; i.e., Berger would provide 80% of the money for the acquisitions and would receive 80% of the profits from any future sale, and Weinstein would provide the remaining 20% of the funds and would receive 20% of any profits.  This representation was false; Weinstein did not intend to contribute 20% of the financing for either transaction he discussed with Berger.

67.     Weinstein's representation that he would be investing his own funds was significant to Berger and reinforced the credibility of Weinstein's other representations.

In fact, Weinstein did not invest his own funds towards purchasing either of the two properties.

68.    To further pressure Berger to provide funds by December 18, Weinstein arranged for Leifer to deliver a letter to Berger on December 17, 2006, saying that it was imperative for Berger to immediately fulfill his moral obligation to provide the funding requested by Weinstein.

69.    As a result of intentional misrepresentations and concealments by the Individual Defendants and their agents of the 125-foot height law and its effect in drastically curtailing development of River City, and the other false representations set forth above, Berger was induced to request Kilbride to advance $12 million to the Individual Defendants on December 18, 2006.

70.    As soon as the Individual Defendants knew that the initial $12 million payment was en route, a new Nominee Agreement dated December 19, 2006 was prepared and signed by Chawla and Weinstein, reflecting the new arrangements that they had agreed to whereby Weinstein would immediately pay $12 million which would be forfeited if he defaulted on his $62.5 million purchase.

71.    Chawla used the initial $12 million to complete the purchase of the River City property from R&F Penn.  Furthermore, as a result of the new Nominee Agreement signed by Chawla and Weinstein on December 19, 2006, Weinstein was in default on December 20, 2006 and Berger's $12 million was subject to being forfeited under that contract as soon as Chawla completed his own $32.5 million acquisition of River City.

II.    **The 2040 Market Street Fraud**

72.    At the same time that the Individual Defendants were implementing the River City fraud, they implemented another fraudulent scheme to obtain additional

money from Berger for a second parcel of Philadelphia real estate at 2040 Market Street.

73.   The 2040 Market Street property had on it a vacant 5-story office building. In or about June 2006, shortly after he had arranged to acquire the River City properties, Chawla arranged to acquire 2040 Market Street for approximately $21 million.  As with River City, Chawla planned to flip the property.

74.   In October 2006, shortly after Weinstein signed the initial Nominee Agreement to acquire the River City property, he signed a second contract with Chawla to acquire 2040 Market Street for $28 million.  Thus Chawla expected to achieve a quick $7 million profit.

75.   Weinstein described the 2040 Market Street property in his initial communications with Berger, and Sahaya arranged with Rappoport for Weinstein's "investor group" to receive a presentation on that property as well as River City.

76.   On December 6, 2006, in addition to the presentation to Berger regarding River City, Rappoport made a presentation regarding the designs Chawla had commissioned him to prepare for what the Individual Defendants described as an "air rights" development of 2040 Market Street.

77.   The "air rights" transaction that the Individual Defendants devised was based on their proposal that Berger would purchase the land and existing building at 2040 Market Street, and then sell the right to develop a tower that would surround and rise above the existing building while retaining ownership of the land and the existing building.

78.     In order to induce Berger to provide funds to buy 2040 Market Street,

Weinstein represented that the property could be acquired for $28 million and

fraudulently represented that he had already received a $31 million offer for the "air

rights" there.  Weinstein represented to Berger that they would be able to buy the

property and imminently sell the "air rights" for $3 million more than they paid while

retaining ownership of the land and existing building.

79.     Weinstein fraudulently concealed from Berger that the $31 million offer

was a fake.

80.     To support Weinstein's lie to Berger regarding the $31 million offer for the

2040 Market Street "air rights," the Individual Defendants created fraudulent letters

appearing to be from an independent investor expressing "strong interest" in purchasing

the air rights.  Specifically, on or about December 14, 2006, Chawla allowed Sahaya to

use WAP's computer system to prepare two letters addressed to WAP, "Attn.:  Mr. Eli

Weinstein," which Sahaya arranged for a friend to print on the friend's business

letterhead and sign.  Thus, when the letters were completed, they appeared to be bona

fide offers from a company named Ram Associates.

81.     One letter created on December 14, 2006, was back-dated July 21, 2006

and expressed a "strong interest" in purchasing the 2040 Market Street "air rights" for

$25 million.  The second letter created on December 14, 2006, was dated

December 21, 2006 and purported to be "further to our letter dated 7/21/06 and your

response thereof."  The second letter went on to state that Ram Associates "would like

to increase our offer to $31 million" for the "air rights."

82.     In fact, Ram Associates had no interest in or capacity to purchase the 2040 Market Street "air rights" for either $25 or $31 million.  The letters were prepared to create the false appearance that there was a market for the "air rights" at a price that would make the transaction described by Weinstein to Berger profitable.

83.     Based on the Individual Defendants' lies with respect to 2040 Market Street, on or about December 18, 2006, Berger was induced to request Busystore to advance an additional $9.5 million to the control of the Individual Defendants.

## III.     The Individual Defendants' Further Fraudulent Activities to Keep Berger's Funds Flowing

84.     Although Chawla received the $12 million transmitted by plaintiffs for the River City property, Weinstein diverted the $9.5 million that plaintiffs transmitted for the 2040 Market Street property to other uses.  The Individual Defendants then embarked on further fraudulent activities to induce Berger to transfer more money to them in addition to the $21.5 million he had transmitted on or about December 18, 2006.

85.     On or about January 1, 2007, Weinstein visited Berger's home in London. At that time, Weinstein falsely represented that he had completed the acquisitions of the River City and 2040 Market Street properties, but that there had been unexpected expenses requiring Berger to provide further funds.  In addition, Weinstein falsely described complications with respect to the sale of the 2040 Market Street "air rights" to Ram Associates which also required new funds from Berger.  To sustain Berger's interest in the 2040 Market Street "air rights" deal, Weinstein arranged for Leifer to give Berger a copy of the fraudulent Ram Associates letter dated December 21, 2006.

86.     To support the lie that Weinstein had used Berger's $9.5 million to acquire 2040 Market Street, Weinstein instructed Pine Projects to obtained an official bank

check, dated December 14, 2006, in the amount of $9.5 million made payable to Montgomery Abstract, the company that handled closings for Chawla. The check was not delivered to Montgomery Abstract but, rather, was re-deposited into Weinstein's checking account after a copy of the front of the check was made.

87.    To support his lie to Berger that he had completed the closing on River City on December 20, 2006, Weinstein instructed Pine Projects personnel to purchase a bank check, make a copy of it and alter the information on the copy. Pine Projects purchased a bank check in the amount of $10 made payable to World Acquisition Partners Inc. At Weinstein's instruction, a copy of that bank check was altered to make it appear to be a bank check dated December 20, 2006, in the amount of $4,663,47.45.

88.    To support his lie to Berger regarding unanticipated closing expenses, Weinstein instructed Pine Projects to create a document which appeared to be a copy of a Pine Projects check, dated December 20, 2006, payable to Montgomery Abstract in the amount of $3,961,150.14. Despite the precise amount set forth on the document, in fact neither Weinstein nor Pine Projects had paid any such closing costs to Montgomery Abstract or any other party.

89.    After Weinstein returned from a meeting with Berger in London in about early January 2007, the Individual Defendants created numerous fraudulent documents to create the appearance that the lies Weinstein told Berger were true.

90.    For example, Weinstein and Chawla prepared and signed a document intended to look like a closing statement for Weinstein's acquisition of 2040 Market Street. They dated the document January 4, 2007, and indicated that $9,648,106.96 had been due from Weinstein at the closing. In fact, no closing took place on that day,

no money was paid by Weinstein and no interest in 2040 Market Street was transferred by Chawla.

91.    In addition, Weinstein instructed Pine Projects to create a document appearing to be a check drawn on Weinstein's company Pine Projects, dated January 4, 2007, payable to Mark Stephens Company for $7,982,500.  The memorandum line on the check falsely stated that the check was issued to prepay two years' interest on a $51.5 million mortgage on the River City property.  The Mark Stephens Company is a business entity owned and operated by Sahaya and it has no involvement in real estate transactions.  In fact, no such check was ever issued to the Mark Stephens Company and there was no $51.5 million mortgage on the River City property.

92.    In addition, Weinstein instructed Pine Projects personnel to purchase a bank check, make a copy of it and alter the information on the copy.  Pine Projects purchased a bank check payable to Samantha Martin in the amount of $311.  At Weinstein's instruction, a copy of that bank check was altered to make it appear to be a bank check dated January 14, 2007, payable to Mark Stephens Co. in the amount of $23 million.

93.    The $23 million check was fraudulently created to support Weinstein's lie to Berger regarding unexpected complications in completing the sale of the 2040 Market Street air rights.  Specifically, Weinstein represented that, in order to complete the sale of the 2040 Market Street "air rights," it was necessary for him to pay back or retire $23 million of the purported mortgage debt that had been assumed in connection with the purported purchase of the River City and 2040 Market Street properties.

94.     To further support Weinstein's lie that he had repaid $23 million of debt, Weinstein asked Sahaya to obtain written confirmation from Chawla that Weinstein had paid $23 million of the debt that had been assumed.  Sahaya then prepared an e-mail addressed to Weinstein's lawyer which, among other things, falsely stated that "When we closed our deal [on River City] with Eli we gave him a note for $31.5M, which does not include the $20M [mortgage] owed to Kennedy Funding.  Accordingly, Eli has paid down $23M of this note as of first week of Jan. 07."  Sahaya transmitted this information by false e-mail to Chawla.  Chawla copied and pasted the text into his own e-mail which he sent to Weinstein's lawyer.  In fact, there was no such note and there was no $23 million repayment by Weinstein.

95.     Based on Weinstein's lies regarding the need for additional funds for the transactions that Berger had been fraudulently induced to participate in, Berger requested Towerstates and Ardenlink to advance an additional $4 million and $6 million, respectively, to Weinstein's control on January 8, 2007; and, Berger requested Bergfeld to advance an additional $5 million to Weinstein's control on January 19, 2007.

96.     As a result, by January 19, 2007, Berger and the other plaintiffs had been fraudulently induced to deliver $36.5 million to the defendants.  The defendants diverted much of plaintiffs' money from the River City and 2040 Market Street transactions to other real estate properties.

97.     By February 2007 Berger began to suspect that there was something wrong in his dealings with Weinstein.  Despite Weinstein's continuing denials (supported by Weinstein's presentation to Berger of the false documentation described above) and Weinstein's pleas for more money, Berger refused to cause further funds to

be advanced to the Individual Defendants until complete and satisfactory documentation of all the transactions Weinstein described was presented.

98.     Unable to document the purported transactions to Berger's satisfaction, Weinstein sent Berger a notice of termination of their relationship in February 2007. Berger immediately accepted the termination and demanded a return of plaintiffs' $36.5 million.  None of those funds have been returned to plaintiffs by Weinstein or any other defendant.

99.     Weinstein knew that he would have to provide additional funds to Chawla in order to complete the acquisition of the numerous parcels of real estate for which Weinstein had made payments to Chawla and, therefore, Weinstein attempted to defraud other investors in early 2007.

100.    While Chawla was waiting for Weinstein to provide additional funds, he arranged a new $25.5 million mortgage on the River City property.  The new mortgage from UBS Real Estate Securities, Inc. was funded on February 28, 2007.  As a result of the new mortgage, Chawla further enriched himself and burdened the River City property.

101.    Chawla began to get impatient with Weinstein.  When Weinstein was copied on e-mail messages to Sahaya complaining about Weinstein's failure to provide the funds he had promised, Sahaya responded, stating, "I think you should not cc Eli on these emails.  I am trying real hard to keep this together and we need to keep getting money from him!!!"

102.   When Sahaya thereafter explained to Chawla that Weinstein was working on raising money from other investors to pay what he had promised, Chawla responded by labeling Weinstein "a liar and a cheat":

> "You are forgetting that Eli had enough funds to close from Berger 7 months ago.  Are we supposed to be sympathetic because he is trying to induce another investor for the same property?  We are not buying stories from a liar and a cheat."

103.   Ultimately, Chawla declared Weinstein in default under the December 19, 2006 Nominee Agreement for the purchase of River City and in default under the October 2006 contract for the purchase of 2040 Market Street.

## IV.    The Ultimate Result of Defendants' Fraudulent Conduct

104.   By February 2007, Berger realized that defendants were engaged in a scheme to defraud, and that plaintiffs had delivered $36.5 million to defendants and received nothing in return.  Chawla and various entities he was involved with had received approximately $24.5 million of plaintiffs' funds and Weinstein had received approximately $12 million of plaintiffs' funds.  Chawla and Weinstein gave Sahaya approximately $800,000 for his assistance in perpetrating the fraud.

**FIRST CLAIM FOR RELIEF AGAINST CHAWLA, SAHAYA,
WEINSTEIN, WAP AND PINE PROJECTS:
FRAUD**

105.   Plaintiffs repeat each of the allegations in paragraphs 1-104 above.

106.   The Individual Defendants, WAP and Pine Projects, directly and indirectly, made numerous material misrepresentations to Berger and concealed information the disclosure of which was necessary to render numerous representations of the Individual Defendants not materially misleading.  The Individual Defendants made their

misrepresentations to Berger, and concealed information from him, knowingly and with the intent to defraud.

107.    Neither Berger nor any other plaintiff knew the truth regarding the defendants' material misrepresentations and omissions.

108.    Plaintiffs justifiably relied on the materially misleading statements by the defendants to their detriment.  Had plaintiffs known the truth, plaintiffs would not have agreed to enter into any transactions with any of the Individual Defendants and plaintiffs would not have transmitted any of their funds to defendants' control.

109.    As a proximate result of the Individual Defendants' intentionally fraudulent conduct, plaintiffs suffered damages in the amount of $36.5 million.

110.    In addition, because the fraudulent conduct of the defendants was malicious and shocking to the conscience, they should each be held liable for punitive damages in an amount not less than $50 million.

## SECOND CLAIM FOR RELIEF AGAINST CHAWLA, SAHAYA AND WEINSTEIN: CONVERSION

111.    Plaintiffs repeat each of the allegations in paragraphs 1-110 above.

112.    Chawla, Weinstein and Sahaya received plaintiffs' funds based on Weinstein's and Chawla's false representations and material omissions, as described above.

113.    The Individual Defendants knew that the delivery of plaintiffs' funds arranged by Berger was intended solely for the acquisition of the River City and 2040 Market Street properties.

114.    The Individual Defendants wrongfully exercised dominion and control over plaintiffs' funds.

115.    Despite repeated requests, the Individual Defendants have refused to return plaintiffs' funds.  Instead, the Individual Defendants have converted plaintiffs' funds for their own use.

116.    As a proximate result of the Individual Defendants' conversion, plaintiffs have been damaged in the amount of $36.5 million.

## THIRD CLAIM FOR RELIEF AGAINST CHAWLA, SAHAYA, WEINSTEIN, WAP AND PINE PROJECTS: CIVIL CONSPIRACY

117.    Plaintiffs repeat each of the allegations in paragraphs 1-116 above.

118.    As set forth above, Chawla, Weinstein and Sahaya entered into agreements and conspired with each other for the common purpose of defrauding Berger.

119.    The Individual Defendants worked in concert, among other things, to orchestrate meetings and create false documents to obtain $36.5 million from plaintiffs and conceal their misdeeds.

120.    Chawla, Weinstein and Sahaya actively participated in and benefited from the fraudulent scheme.

121.    Chawla, Weinstein and Sahaya each entered into the conspiracy and acted in furtherance thereof for the purpose of injuring plaintiffs' financial interests by means of fraud.

122.    Plaintiffs had no knowledge of the falsity of the foregoing representations and omissions, and justifiably relied on them to their detriment.

123.    As a proximate result of defendants' fraud, plaintiffs have been damaged in the sum of $36.5 million.

124.    In addition, because defendants' acts were fraudulent, malicious, and

shocking to the conscience, the Court should award punitive damages against them in

the amount of $50 million.

### FOURTH CLAIM FOR RELIEF AGAINST WEINSTEIN:<br>PROMISSORY ESTOPPEL

125.    Plaintiffs repeat each of the allegations in paragraphs 1-124 above.

126.    Weinstein promised to transfer an 80% interest in the River City property

and 2040 Market Street in consideration for Berger providing funds to Weinstein; and, in

reliance upon Weinstein's promise, Berger arranged for Weinstein or entities he

controlled to receive $36.5 million from plaintiffs.  Plaintiffs would never have parted with

these funds had Weinstein not promised to transfer an 80% interest in the River City

property and 2040 Market Street in exchange for their investment.

127.    Plaintiffs relied on Weinstein's promise, to their detriment, and their

reliance on Weinstein's promise was reasonable and foreseeable.

128.    Plaintiffs have sustained unconscionable injury by reason of their reliance

on Weinstein's promise in the amount of $36.5 million.

### FIFTH CLAIM FOR RELIEF AGAINST WEINSTEIN,<br>CHAWLA, 2040 MARKET ASSOCIATES, L.P.,<br>JFK BLVD ACQUISITION PARTNERS LP,<br>PINE PROJECTS LLC, WORLD ACQUISITION<br>PARTNERS CORPORATION AND SAHAYA:<br>UNJUST ENRICHMENT

129.    Plaintiffs repeat each of the allegations in paragraphs 1-128 above.

130.    Weinstein and Berger shared a confidential and fiduciary relationship.

131.    Berger caused $36.5 million to be transferred by the other plaintiffs to the

control of Weinstein and Chawla based on the Individual Defendants' false

representations concerning the River City and 2040 Market Street properties, including

the representations that (a) the money was immediately needed for the purchase of 2040 Market Street and the River City property, (b) the River City property would be financed by a $51.5 million mortgage from an arms' length commercial lender, and (c) a Berger-Weinstein venture, in which Berger was to have an 80% interest, would be acquiring legal title to the properties.

132.    Chawla, WAP, Weinstein, Pine Projects, JFK BLVD Partners LP, 2040 Market Associates, LP and Sahaya, and each of them, accepted and retained benefits from plaintiffs' money.  The defendants would be unjustly enriched If they were permitted to keep plaintiffs' $36.5 million.  It would be inequitable for them to retain plaintiffs' money and not to provide value to plaintiffs for the money they received from the plaintiffs.

133.    In addition, the defendants used plaintiffs' money to obtain and retain unique benefits for themselves: the titles to and control of 2040 Market Street and the River City property.

134.    It would be inequitable for defendants to retain their interests in 2040 Market Street and River City property without paying plaintiffs for them.

135.    A constructive trust should be imposed on 2040 Market Street and the River City property to the extent of plaintiffs' $36.5 million investment, relating back to December 18, 2006, the date on which the constructive trust arose as a result of the first of plaintiffs' payments intended for the purchase of the properties, as well as on all other properties in which defendants invested plaintiffs' money.

WHEREFORE, plaintiffs request that judgment be entered against defendants, as follows:

A.      Awarding compensatory damages against the defendants under the First Claim for Relief, jointly and severally, in the amount of $36.5 million, plus prejudgment interest from the dates of plaintiffs' wire transfers of his funds;

B.      Awarding punitive damages against each of the defendants under the First Claim for Relief in the amount of $50 million;

C.      Awarding compensatory damages against each of the defendants under the Second Claim for Relief, jointly and severally, in the amount of $36.5 million, plus prejudgment interest and interest from the dates of plaintiffs' wire transfers of the funds;

D.      Awarding compensatory damages against each of the defendants under the Third Claim for Relief, jointly and severally, in the amount of $36.5 million, plus prejudgment interest and interest from the dates of plaintiffs' wire transfers of the funds;

E.      Awarding punitive damages against each of the defendants under the Third Claim for Relief in the amount of $50 million;

F.      Awarding compensatory damages against defendant Weinstein under the Fourth Claim for Relief in the amount of $36.5 million, plus prejudgment interest and interest from the dates of plaintiffs' wire transfers of the funds;

G.      Ordering that a constructive trust be imposed under the Fifth Claim for Relief, on 2040 Market Street and the River City property, relating back to the date of plaintiffs' first payment, to the extent of plaintiffs' $36.5 million investment, as well as on any other properties in which defendants invested plaintiffs' funds;

H.      Enjoining defendants from transferring any interest in 2040 Market Street and the River City property, including the air rights thereon, until the monetary damages awarded have been paid in full;

I.    Awarding plaintiffs their reasonable attorneys' fees, costs and
disbursements of this action; and

J.    Granting plaintiffs such other relief as the Court deems proper.

Dated:  August 20, 2008

                              BROWN STONE NIMEROFF LLC

                              By:_____

                                    Antoinette R. Stone
                                    (Signature Validation Code ARS3519)
                                    1818 Market Street
                                    Suite 2300
                                    Philadelphia, PA  19103
                                    (267) 861-5330

                                    - and -

                              KAYE SCHOLER LLP

                                    Richard C. Seltzer
                                    Michael Braff
                                    425 Park Avenue
                                    New York, NY 10022
                                    (212) 836-8402